UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEANETTE LOFTON,

    Plaintiff,                           Civil Action No. 12-10327

       v.                        District Judge BERNARD A. FRIEDMAN
                                      Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Jeanette Lofton ("Plaintiff"), currently proceeding *pro se,* brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On October 27, 2009, Plaintiff applied for DIB and SSI, alleging disability as of

December 31, 2002 (Tr.144-150, 151-153). After the initial denial of her claim, Plaintiff requested an administrative hearing, held on June 17, 2011 in Livonia, Michigan (Tr. 37). Administrative Law Judge ("ALJ") Ramona Fernandez presided. Plaintiff, represented by attorney Jeremy Swick, testified (Tr. 43-69), as did Vocational Expert ("VE") Richard Szydlowski (Tr. 69-74 ). On July 13, 2011, ALJ Fernandez issued a partially favorable decision, finding that while Plaintiff not disabled on or prior to her last date insured for DIB ("LDI") of December 31, 2008, she was entitled to SSI as a result of a disability beginning on January 16, 2010 (Tr. 22, 31-32). On November 10, 2011, the Appeals Council denied review (Tr. 11-15). Plaintiff filed the present action on January 25, 2012.

## BACKGROUND FACTS

Plaintiff, born January 14, 1960, was 51 at the time of the administrative decision (Tr. 32, 144). She completed four or more years of college and worked previously as a housekeeping aide and secretary (Tr. 176, 184). She alleges disability as a result of diabetes, depression, arthritis, chronic obstructive pulmonary disease ("COPD"), "breast disease," anemia, focal neuropathy, peripherial neuropathy, hypertension, and a "possible" stroke (Tr. 175).

### A.   Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by stating that Plaintiff was last engaged in "substantial employment" on December 31, 2002* (Tr. 43).

Plaintiff then offered the following testimony:

She stood 5' 5" and weighed 246 pounds (Tr. 43). She held a current driver's license and continued to drive (Tr. 44). She received an associates degree in organizational administration in 2004 (Tr. 44). She worked in 2004 doing medical billing (Tr. 44). She stopped working after two months as a result of back problems (Tr. 44-45). She worked briefly for a temporary employment agency in 2009 (Tr. 47). She worked as a secretary for a state court between 1999 and 2002 (Tr. 46). Prior to the secretarial job, she worked as a housekeeper (Tr. 46).

Plaintiff began taking classes in 2005 and received a bachelor's degree in 2008 from Central Michigan University ("CMU") (Tr. 48, 50). In January, 2010, she began online studies toward a master's degree at Lawrence Technological University ("LTU") (Tr. 48, 50). The CMU classes were "mostly online" but for nine months in 2005 and 2006, she attended classes in Mt. Pleasant, Michigan (Tr. 50). She ended up receiving "incompletes" in her first semester at LTU due to health problems, but retook the classes and received credit the following autumn (Tr. 49). She currently spent up to 15 hours a week studying or preparing assignments for the online courses (Tr. 50).

Plaintiff began treatment with Dr. Tatu in January, 2010, but discontinued treatment after five months (Tr. 52-53). Dr. Tatu had recommended breast reduction surgery, but her insurance would not approve the procedure (Tr. 53). She had been prescribed a daily exercise routine but experienced pain while exercising (Tr. 53). Currently, she did not follow an exercise routine (Tr. 53). She received short-term treatment for Carpal Tunnel Syndrome

...

("CTS") in 2010 or 2011 (Tr. 54). She controlled her blood sugar levels with medication (Tr. 54). She had not received treatment or taken prescribed medication for COPD for "a while" (Tr. 54). She took Claritin for respiratory "flare-ups" occurring in "really hot or really cold" weather (Tr. 55). She characterized her respiratory problems as "really bad" in 2005 or 2006 (Tr. 55). Hypertension was only partially controlled with medication (Tr. 54).

Plaintiff saw an individual once in 2007 for a consultative psychological examination, but otherwise had not received mental health treatment (Tr. 57). She experienced pain and limitation as a result of arthritis (Tr. 57). The arthritis created the secondary condition of spinal stenosis, which caused arm and leg weakness and numbness (Tr. (Tr. 58). She was unable to walk even half a block due to leg problems (Tr. 58). She lived alone in a third-floor apartment that she accessed by a stairway (Tr. 59). She was able to cook and perform laundry chores (Tr. 59). She shopped for groceries with her brother (Tr. 60). She spent her day "managing pain" and reading (Tr. 60). She had first been prescribed psychotropic medicine two months before the hearing (Tr. 69).

In response to questioning by her attorney, Plaintiff testified that physical symptoms required her to recline for a total of four to six hours each day (Tr. 60). Her back condition required her to change positions periodically (Tr. 60-61). She was able to sit or stand for up to 20 minutes before requiring a position change (Tr. 62). While grocery shopping, she divided her time between walking and using the riding cart (Tr. 63). She left home only when required (Tr. 63). She slept poorly due to body pain, excessive urination, and

intermittent constipation and diarrhea (Tr. 64).

She left her job at the courthouse in 2002 due to back pain and irritable bowel syndrome (Tr. 66). She later stopped working as a medical billing clerk due to her inability to sit at a computer for long periods (Tr. 67). During her time in Mt. Pleasant, she received a number of "incomplete" grades due to diabetes and arthritis (Tr. 67). She currently received medical treatment and food stamps from the government (Tr. 68). She received "the most discomfort" from arthritis (Tr. 68).

### B.     Medical Evidence

#### 1. Records Created Between December 31, 2002 and January 15, 2010

March, 1999 imaging studies performed in response to Plaintiff's report of chest pain were unremarkable (Tr. 354, 361, 364-366, 437, 439). August, 2001 records state that Plaintiff was evaluated for IBS in 1993 but did not seek followup treatment (Tr. 350). A biopsy of the small bowel taken the following month was negative for malignancy (Tr. 426). Testing was also negative for Crohn's disease (Tr. 429). At the time of the appointment, Plaintiff reported intermittent discomfort (Tr. 350). An examination of the abdomen was negative for abnormalities (Tr. 351). Plaintiff sought emergency treatment in January, 2002 for chest pain (Tr. 417). A CT of the chest was unremarkable (Tr. 418). In August, 2005, Beebe William, M.D. noted that Plaintiff had stopped all medication in November, 2004 due to a loss of employment (Tr. 243). November, 2005 treating notes state that Plaintiff

reported "painful feet, but a slight improvement in body aches (Tr. 241). February, 2006 treating notes by Dr. William state that Plaintiff reported "feeling pretty good" (Tr. 239). Plaintiff reported that she had "no complaints" (Tr. 239).

In June, 2007, Plaintiff sought emergency treatment for chest pain (Tr. 254). She reported "episodes of reflux" (Tr. 254). Treating staff noted that her blood sugar levels were controlled (Tr. 254). She was referred for dietary counseling (Tr. 255). The same month, a routine gynecological exam was unremarkable (Tr. 381). Plaintiff was urged to keep track of her blood sugar levels (Tr. 382). A physical examination was otherwise unremarkable (Tr. 393). In July, 2007, Ron Samaritan, M.D. stated on a prescription pad that Plaintiff was "currently suffering from major depression" and that "[h]er studies may suffer as a result" (Tr. 252). In December, 2007 and March, 2008, Plaintiff sought emergency treatment for bronchitis (Tr. 380). March, 2009 testing showed a reduced risk of coronary artery disease (Tr. 261).

In February, 2008, Plaintiff sought emergency treatment for abdominal pain (Tr. 401). A physical examination was remarkable for mild tenderness of the abdomen, but otherwise unremarkable (Tr. 401).

### 2. Records Created Subsequent to the Relevant Period

In January, 2010, Horia M. Tatu, M.D. commenced treatment of Plaintiff, noting that her hypertension was uncontrolled (Tr. 321). Dr. Tatu advised Plaintiff to lose weight (Tr. 323). In March, 2010, Dr. Tatu noted that Plaintiff's blood sugar levels were not well

controlled (Tr. 319). In April, 2010, Todd Best, M.D. prescribed splints for bilateral Carpal Tunnel Syndrome (Tr. 280-281, 291-292). The same month, Dr. Tatu prescribed Vicodin for upper back pain (Tr. 317). Nerve conduction studies of the lower extremities showed "mild peripheral neuropathy" (Tr. 289). The same month, Plaintiff was administered nitroglycerin for chest pain during the course of a stress test (Tr. 294). The stress test revealed "moderate stress induced ischemia" of the left ventricle but test results were otherwise within normal limits (Tr. 302). Cardiologist Fuad Katbi, M.D. recommended thyroid testing and weight loss (Tr. 303).

The following month, a cardiac catheterization was negative for heart disease (Tr. 327). Plaintiff was deemed a "good candidate" for gastric bypass surgery (Tr. 327). In June, 2010, Dr. Tatu noted Plaintiff's reports of continued back pain and body aches (Tr. 315). He prescribed Robaxin and referred Plaintiff for weight loss and breast reduction surgery (Tr. 316). In July, 2010, Dr. Tatu opined that unless Plaintiff "will be able to have a breast reduction, she will continue to be disabled by . . . excruciating pain . . . incapacitating her to perform any duties leading to employment restrictions" (Tr. 283).

In August, 2010, Herbert L. Isaac, III, M.D. noted Plaintiff's complaints of back pain (Tr. 305). The following month, imaging studies of the heart showed unremarkable results (Tr. 306). An x-ray of the cervical spine was consistent with paravertebral muscle spasms (Tr. 307). An x-ray of the lumbar spine showed osteophytic spurring but the absence of

spondylolysis or fracture[1] (Tr. 308). In May, 2011, Plaintiff reported rectal bleeding and continued back pain (Tr. 458). In June, 2011, Plaintiff was prescribed Tramadol for body pain (Tr. 452). She was urged to lose weight (Tr. 493). Plaintiff requested a referral for physical therapy (Tr. 456).

### C. Vocational Expert Testimony

VE Richard Szydlowski classified Plaintiff's former work as a hospital cleaner as exertionally medium and unskilled; secretary, sedentary/skilled and medical billing clerk sedentary/semiskilled[2] (Tr. 70, 229), The ALJ then posed the following hypothetical limitations to the VE, taking into account Plaintiff's age, education, and work experience:

> I'd like you to assume an individual who is capable of light work [limited to occasional] climbing, stooping, kneeling, crouching, crawling or balancing. Never using ladders, ropes or scaffolds. And who requires a sit/stand option at will. Could such an individual perform any of the past work ? (Tr. 70).

In response, the VE testified that although such limitations would preclude Plaintiff's past relevant work, the above-described individual possessed transferrable skills for the semiskilled/sedentary work of an information clerk (Tr. 71). He testified further that the

---

[1] March, 2011 CTs of the cervical and thoracic spine are unreadable (Tr. 459-460).

[2] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

same individual could perform the light, unskilled work of a cashier (6,000 positions in the regional economy); assembler (4,000); and mail sorter (2,000) (Tr. 71). The VE stated that if the above-described individual were limited to sedentary work, she could perform the job of an order clerk (5,000); document preparer (2,000); and security monitor/receptionist (4,000) (Tr. 72). He stated that if the individual were further limited by the preclusion of "forceful gripping or pinching" and the avoidance of concentrated exposure to vibration, the job numbers would remain unchanged (Tr. 72). He testified that if the individual were also limited to three-step tasks, the semiskilled job of information clerk would be eliminated but the unskilled job numbers would be unaffected (Tr. 72-73). However, the VE stated that if the individual were required to take four-hour breaks over the course of an eight-hour workday, all competitive employment would be precluded (Tr. 73). He stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") with the exception the testimony regarding a sit/stand option, which was based on his professional experience (Tr. 73).

### D. The ALJ's Decision[3]

Citing the administrative transcript, the ALJ found that as of December 31, 2002 to January 15, 2010, Plaintiff experienced the severe impairments of "diabetes mellitus, hypertension, and obesity" but that none of the conditions met or equaled any impairment

---

[3] The ALJ's sequential findings regarding Plaintiff's condition from January 16, 2010 forward (supporting a finding of disability as of that date) are not in dispute and are thus omitted from discussion in this section.

listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 25-26). The ALJ found that through January 15, 2010, Plaintiff retained the residual functional capacity ("RFC") for exertionally light work with the following additional restrictions:

> [L]imited to occasional climbing, stooping, kneeling, crouching, crawling, and balancing; no climbing ladders, scaffolds, or ropes; and requires a sit/stand option at will (Tr. 26).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform her past relevant work for the relevant period, she could work as a cashier, assembler, and mail sorter (Tr. 31. She noted that all the positions included a sit/stand option (Tr. 31).

The ALJ noted the "brief treatment record" between 2002 and the DLI of December 31, 2008, noting further that the existing records did not support a finding of disability (Tr. 27). She cited 2005 records showing a decrease in body aches and reduced symptoms of diabetes (Tr. 27). The ALJ observed that Plaintiff's allegations of disability prior to the DLI were undermined by her ability to attend CMU between 2005 and 2008 and her ability to obtain a bachelor's degree (Tr. 27-28). The ALJ noted that none of Plaintiff's treating sources prior to the end of 2008 opined that she was disabled (Tr. 28). She cited Dr. Samarian's July, 2007 statement that Plaintiff's studies "may suffer" as a result of depression, but noted that the statement was unaccompanied by treating records or a functional evaluation (Tr. 28).

The ALJ supported her rationale for an onset of disability date of January 16, 2010 by noting that Plaintiff was diagnosed with additional medical impairments in 2010 (Tr. 28).

She cited the treating records showing that Plaintiff's diabetes worsened in 2010 (Tr. 28). She also supported her finding that Plaintiff was limited to unskilled, sedentary work as of January, 2010 by citing Dr. Tatu's July, 2010 opinion that Plaintiff would be disabled without breast reduction surgery[4] (Tr. 28).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

---

[4] Plaintiff turned 50 on January 14, 2010 (Tr. 144). As of her 50th birthday, a finding that her RFC was reduced to unskilled, sedentary work would direct a finding of disability. *See Rogers v. CSS*, 2000 WL 799332, * 1 (6th Cir. June 9, 2000).

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### Substantial Evidence Supports the Determination that Plaintiff was Not Disabled Before the Expiration of DIB

Plaintiff, proceeding *pro se,* disputes the determination that she was not disabled until January 16, 2010. *Plaintiff's Motion for Summary Judgment, Docket #25*. She contends that

she was disabled prior to the December 31, 2008 expiration of DIB.[5] *Id.* She attributes the lack of medical records from this period to her inability to obtain health insurance. *Id.* at 3. Plaintiff also argues that she suffered from depression and bipolar disorder since childhood but the conditions became increasingly severe from 2000 forward and ultimately resulted in her 2002 resignation from the state court secretarial position. *Id.* at 4-5. She also argues that she suffers from debilitating back pain. *Id.* at 6-7.

Plaintiff argues, in effect, that her inability to obtain medical insurance, rather than the lack of symptomology, explains the sparse pre-2009 records. She is correct that the ALJ was required to consider possible explanations for the lack of records. Pursuant to SSR 96–7p, 1996 WL 374186, *7, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."

Nonetheless, Plaintiff's claim that financial constraints stymied her ability to receive additional treatment, taken as true, does not provide grounds for remand. As noted by the

---

[5] While the SSA awards DIB to disabled persons based on their past earnings and payment of social security taxes pursuant to Title II of the Social Security Act, 42 U.S.C. § 423, the SSA provides SSI to disabled individuals on the basis of financial need, pursuant to Title XVI of the Social Security Act. *U.S. v. Smith,* 294 F.Supp.2d 920, 922 (E.D.Mich. 2003); 42 U.S.C. § 1381 *et seq.*

ALJ, the earlier treating records, while not extensive, generally undermine, rather than support Plaintiff's claims of disability for this period. The ALJ cited 2005 treatment records stating that Plaintiff reported an improvement in body aches and that the diabetes was well controlled (Tr. 27). The treating notes for the period in dispute almost wholly support the ALJ's determination. In February, 2006, Plaintiff reported that despite losing her health insurance, she felt "pretty good" and "had no complaints" (Tr. 239). June, 2007 records state that her blood sugar levels were well controlled (Tr. 254). While the record contains Dr. Samaritan's July, 2007 statement that Plaintiff was suffering from major depression, the ALJ noted that it was unclear whether the statement was based on Plaintiff's allegations or clinical testing (Tr. 252). Moreover the inference that Plaintiff's symptoms of depression were short-lived is supported by treating records before and after July, 2007 which do not make mention of a mood disorder or other psychological condition (Tr. 239, 254-255 380, 386).

Further, the records created between 2002 and the end of 2008 show that Plaintiff sought and received routine gynecological treatment, diabetes monitoring, treatment for abdominal pain, cardiac testing, and treatment for various respiratory complaints. Plaintiff's ability to obtain treatment, as required, undermines the claim that her inability to establish disability before the end of 2008 was attributable to the lack of health insurance.

Likewise, the ALJ did not err in finding that Plaintiff's ability to obtain a bachelor's degree during the period at issue undermined the claims of disability as a result of physical and psychological limitations (Tr. 27-28). Notably, while Plaintiff alleges that she was

disabled as of the end of 2002, she acknowledged that she received an associate's degree in 2004, commenced undergraduate work in 2005 through CMU, and was able to complete a bachelor's degree by 2008 (Tr. 44, 50-51). Further, Plaintiff's argument that Defendant did not meet its burden to establish that she was not disabled before December 31, 2008 misstates the applicable law. Pursuant to 20 CFR § 404.1512(a), a claimant is required to "'furnish medical and other evidence that [the SSA] can use to reach conclusions about [her] medical impairment(s) and ... its effect on [her] ability to work on a sustained basis.'" *Cranfield v. Commissioner, Social Security,* 79 Fed.Appx. 852, 858, 2003 WL 22506409, *5 (6th Cir. November 3, 2003)(citing § 404.1512(a)). The existing medical records for the applicable period, combined with Plaintiff's ability to obtain a bachelor's degree during this period, stands at odds with her claim of disability. Because substantial evidence supports the finding that Plaintiff was not disabled on or before December 31, 2008, a remand is not warranted.

In closing, it should be noted that the decision to uphold the ALJ's findings should not be read to trivialize Plaintiff's current difficulties. Nonetheless, the ALJ's determination that the Plaintiff was not disabled until January 16, 2010 is generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be

GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                   s/R. Steven Whalen
                                                   R. STEVEN WHALEN
                                                   UNITED STATES MAGISTRATE JUDGE

Dated: August 7, 2014

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on August 7, 2014, electronically and/or by U.S. mail.

                                    s/Carolyn M. Ciesla
                                    Case Manager to the
                                    Honorable R. Steven Whalen